**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

UNITED STATES OF AMERICA,

Plaintiff,

vs.

DYLAN ANTHONY DAVIS,

Defendant.

No. CR 17-4074-MWB

**OPINION AND ORDER**
**REGARDING DEFENDANT'S**
**MOTION TO SUPPRESS**

_____

**TABLE OF CONTENTS**

I.    **INTRODUCTION**................................................................3
     A.    *Findings Of Fact*....................................................3
          1.    *The stop* ....................................................3
          2.    *Initial investigation* ......................................4
          3.    *The wait for verification* ..................................6
          4.    *The call to the rental company* .............................7
          5.    *Removal of the occupants* ...................................10
          6.    *The vehicle search and the arrests*..........................12
          7.    *The statements during transport*.............................14
     B.    *Procedural Background* ...........................................15
II.   *LEGAL ANALYSIS* .......................................................16
     A.    *The Stop And The Inventory Search*................................17
          1.    *Standing*....................................................17
               a.    *Arguments of the parties* .............................17
               b.    *Analysis*..............................................18
          2.    *Applicability of* **Byrd** .................................22
               a.    *The decision in* **Byrd**..............................22
               b.    *Arguments of the parties* .............................23
               c.    *Analysis* .............................................24
          3.    *The inventory search* ......................................26
               a.    *Pretext and failure to follow protocol*................27
                    i.    *Arguments of the parties* ........................27

    *ii.*  *Analysis*.................................................... 29

   *b.*  *Improper extension of the stop* ............................... 39

    *i.*  *Arguments of the parties* .............................. 39

    *ii.*  *Analysis*.................................................. 40

  *4.*  *The alternative probable cause theory*.............................. 44

   *a.*  *Arguments of the parties* ....................................... 44

   *b.*  *Analysis* ........................................................ 45

  *5.*  *Summary*................................................................ 49

 *B.*  *The Evidence Obtained During Transport*.................................... 49

*III.*  *CONCLUSION* ............................................................... 50

A defendant charged with drug and firearm offenses seeks suppression of evidence seized from a rental car in which he was a passenger and the statements he allegedly made while he was being transported by law enforcement officers to his initial court appearance. While the defendant concedes that the initial stop of the rental car for speeding was valid, he contends that the purported inventory search, conducted after the officer who stopped the car obtained permission from the rental car company to tow the vehicle, was pretextual, because it was not pursuant to any reasonable protocol, and was unreasonably prolonged. He also contends that statements he made while being transported to his initial appearance and arraignment were obtained by the transporting officers in violation of his right to counsel. The prosecution concedes that the statements made during the defendant's transportation to his court appearance must be suppressed, but it disputes the defendant's standing to challenge the vehicle search as well as the merits of his challenge.

2

## I. INTRODUCTION

### A. *Findings Of Fact[1]*

On the evening of November 29, 2017, Sergeant Michael Kober of the Iowa State Patrol (ISP) was parked in the median of Interstate 29, facing northbound, near mile marker 113, within approximately a mile of the Onawa exit, in Monona County, Iowa, conducting traffic enforcement. Sgt. Kober has been with the ISP since 1996. He started as a trooper, and in 2015, he was promoted to sergeant. He has spent his career with the ISP patrolling Iowa's roads, and he estimates that he has conducted thousands of traffic stops and hundreds of vehicle searches. He testified at the suppression hearing that a traffic stop ordinarily takes him about ten to fifteen minutes. On the evening of November 29, 2017, Sgt. Kober had a civilian in his cruiser for a "ride along."

### 1. *The stop*

Sgt. Kober's "dash camera video," Defendant's Exhibit E (Video), shows that, at 9:17 p.m., an SUV in the left southbound lane of I-29 passed Sgt. Kober's parked position at a speed in excess of the posted 70 mph speed limit. Sgt. Kober pulled onto the southbound lane of I-29 and began pursuit. When he caught up with the SUV, which was still traveling in the left lane at 80 miles per hour, and the SUV immediately began braking. After going under an overpass, the SUV pulled over toward the median. Sgt. Kober moved his cruiser into the center of the two southbound lanes and signaled with his spotlight that he wanted the SUV to pull over to the right-side shoulder. I doubt that

---

[1] These findings of fact are based, to some extent, on the parties' proposed findings of fact filed on July 20, 2018. However, they are primarily based on my review of the "dash camera video," the testimony at the suppression hearing, and the exhibits submitted by the parties, including the arresting officer's report. These findings of fact provide the context for the analysis to follow. Some additional findings of fact are set out in the pertinent parts of the legal analysis.

I would have understood the meaning of these signals, even if I had been looking in the rearview mirror of the SUV. There is no evidence in the record that the occupants of the SUV, or a reasonable driver or passenger, would have both seen and understood the signals, either. When the driver of the SUV did not respond to those signals as hoped, Sgt. Kober promptly gave up the attempt to move the stop to the right side of the highway and pulled his cruiser in behind the SUV as it stopped in the median. There was nothing unusual or inappropriate about the manner in which the vehicle was being driven other than its speed. Nor was there anything unusual about the length of time the vehicle took to pull over. Even though traffic was relatively light, Sgt. Kober never requested that the driver move the SUV to the wider shoulder on the right side of the highway. As the two vehicles were coming to a stop, Sgt. Kober commented to his passenger that the vehicle had Georgia plates and was probably a rental, adding, "See the barcode?" referring to a barcode in the rear window. Both the cruiser and the SUV had come to a stop less than one minute after the SUV passed Sgt. Kober's original parked position and approximate thirty seconds after Sgt. Kober had activated his lights.

> **2. Initial investigation**

When Sgt. Kober approached the driver's side of the SUV, he did not detect any smell of drugs, but he did encounter an overwhelming smell of body odor and cigarettes, notwithstanding a "no smoking" sticker on the dash of the SUV. At no time did Sgt. Kober detect any indications that the occupants were under the influence of drugs or alcohol, although he later testified that the passenger initially was asleep or was pretending to be asleep. Sgt. Kober told the occupants that the SUV had been stopped for speeding and requested licenses and the SUV's registration. In response to Sgt. Kober's questions, the occupants immediately and truthfully identified themselves as Noah Pope, the driver, and defendant Dylan Davis, the only passenger. Pope told Sgt. Kober that they did not have the registration, because the car was a rental.

Sgt. Kober made several requests to see the rental agreement in rather quick succession. Video at 2:41-3:03. Pope explained that a person named Cari Rigdon had rented the SUV for "them" in Georgia, that they were driving back to Georgia from North Dakota after dropping off another woman, and that the vehicle was due back the next day, but he admitted that they did not have the rental agreement. *Id*.; *see also* Sgt. Kober's Report, Defendant's Ex. A (Sgt. Kober's Report), 1. Later in the stop, when Sgt. Kober again mentioned that they did not have the rental agreement, Pope told Sgt. Kober that they had been stopped once in North or South Dakota, but the police had not given them any trouble for not having the rental agreement. Video at 4:48-55. Sgt. Kober testified that, based on his training and experience, it is unusual for the renter of a vehicle not to be present in the vehicle during a traffic stop and that it is unusual for the occupants of a rental car not to have the rental agreement. He did not, however, make any attempt to obtain Cari Rigdon's contact information or whereabouts from Pope or Davis or the ISP dispatcher, nor did he make any attempt to contact her to ask if she had given Pope and Davis permission to take the rental car.

Pope began looking for his identification in a backpack that he had pulled from the back seat. Sgt. Kober's Report at 1. Sgt. Kober saw a baggie or baggies in the backpack and believed that Pope was trying to shove it or them back out of sight. When Sgt. Kober asked Pope, "What's in the zip-lock bag?" Pope explained it was a pellet or air gun, but it was in pieces, and handed the bag to Sgt. Kober. Video at 3:16-4:04. Sgt. Kober testified that Pope was very nervous, breathing heavily, and shaking, but Davis did not seem nervous. Sgt. Kober asked several more questions about Pope's and Davis's trip before he observed a long gun case in the back compartment of the SUV. When Sgt. Kober asked what was in it, Davis told him it contained a "nine-millimeter." *Id*. at 6:38-55. When Sgt. Kober asked if it was loaded, Davis replied that he did not know, but promptly agreed to let Sgt. Kober look at it. *Id*. at 6:55-7:06. Sgt. Kober

removed the gun case from the SUV, then opened it on the hood of the SUV. Sgt. Kober asked why they had a gun in a rental car, and Davis explained that he had not wanted to leave it in his truck. Sgt. Kober needed the help of one of the occupants of the SUV to figure out how to release the magazine, but when he did, he found that the magazine was loaded, although there was no bullet in the chamber. *Id*. at 7:06-8:38. Sgt. Kober explained to the occupants of the SUV that guns cannot be transported while loaded in Iowa. *Id*. at 8:53-9:08. Pope produced a Georgia driver's license, but Davis said he had no identification, so he wrote his name and other information on a piece of paper and gave it to Sgt. Kober. Sgt. Kober returned to his cruiser with the gun. *Id*. at 9:33. At that point, the vehicles had been stopped for approximately nine minutes.

### 3.    *The wait for verification*

It took several minutes for dispatch to reply to Sgt. Kober's request for verification of Pope's and Davis's information and to confirm that the gun was not stolen. While waiting, Sgt. Kober told his ride-along passenger something like "he's got drugs [inaudible] no good [?] . . . ," *id*. at 13:02-06,[2] and "there's a dope bag in the bottom of [Pope's] bag that he didn't show me," *id*. at 14:43-52. When another ISP officer, Trooper Farver, arrived on the scene, having heard Sgt. Kober's request for information about a gun over the radio, Sgt. Kober told Trooper Farver that it was his "personal opinion there's dope in the car." *Id*. at 15:35-41. After he told Trooper Farver about the broken pellet gun in the bag, Sgt. Kober also told Trooper Farver, "I think there's another bag in the bottom of his backpack that he kept moving shirts and clothes

---

[2] Davis understands this statement to be, "[T]hese guys are up to no good," but the poor quality of the audio and the noise of a passing truck make it difficult for me to determine precisely what Sgt. Kober said at this point in the stop. Nevertheless, at the suppression hearing, Sgt. Kober admitted that he told Trooper Farver, shortly after that officer arrived on the scene, that "these guys are up to no good." Transcript at 34:7-10.

around trying to cover it up." *Id.* at 16:05-12. Later, while still waiting for information from dispatch, Sgt. Kober added that there were "a whole bunch of zip-lock baggies with Star Wars on them" in the SUV. *Id.* at 20:51

About sixteen minutes after the stop, dispatch began providing Sgt. Kober with some of the information he had requested, but asked for more information to try to check on the status of the gun. A few minutes later, Sgt. Kober announced to his passenger that he would "call EAN Holdings [*i.e.*, Enterprise Rent-A-Car] and see if they want it [the SUV], and then I'll do my inventory." *Id.* at 19:01-19:07. Shortly after that, while discussing the make and model of the gun with his passenger, Sgt. Kober also wondered aloud if "they've been robbing banks." *Id.* at 19:25-31. Sgt. Kober attempted to call EAN Holdings approximately twenty-two minutes after the stop, but that call "failed." *Id.* at 22:30-39. By twenty-five minutes into the stop, Sgt. Kober knew that Pope and Davis had misdemeanor charges in the past, but neither Pope nor Davis had any felony convictions, *id.* at 15:10-35; Suppression Hearing Transcript (Transcript), 28:14-18; Sgt. Kober's Report at 1; had confirmation that the SUV was rented from "EAN Holdings out of Augusta, Georgia," Video at 21:22-30; knew that the gun had not been reported stolen, Transcript at 28:19-25; and knew that Pope had a "driving under the influence (DUI) alcohol/drug" charge in 2010, but no similar violation more recently. Video at 24:55-25:12.

### 4.    *The call to the rental company*

Approximately twenty-five minutes after the stop, Sgt. Kober reached the automated phone system for EAN Holdings, and a minute or so later reached a representative named Carol. *Id.* at 25:11-26:20. Sgt. Kober explained that he had stopped one of their rental vehicles, but the occupants did not have the rental agreement, so he wanted to find out who the renter was, if there were any additional drivers listed,

and what EAN "want[ed] done" with the vehicle. *Id.* at 26:20-38. Carol forwarded Sgt. Kober's call to a supervisor.

      After about a minute on hold, Sgt. Kober's call was answered by another representative who identified himself as Jake. *Id.* at 27:19-28. Sgt. Kober repeated to Jake that he had stopped one of their rental vehicles, but the occupants did not have the rental agreement, adding that the vehicle had supposedly been rented by "some girl"— although the occupants had already told Sgt. Kober the renter's name was Cari Rigdon— so that he was trying to find out "who rented the car, if there were any additional drivers listed, and what you guys want done with the car." *Id.* at 27:29-53. Jake responded that the vehicle was rented to "Cari Rigdon"; that her address was in Georgia; that the vehicle had been rented on the 24th and was due back the next day; and that no additional drivers were listed. At this point, Sgt. Kober did not reveal to Jake that Pope and Dean had already revealed this information to him. *Id.* at 29:20-31:00. Sgt. Kober then asked, again, "What would you guys like done with it?" *Id.* at 31:10-14. Jake responded with a question of his own, "Why were they stopped, if you don't mind me asking?" *Id.* at 31:14-20. Sgt. Kober replied, "They were stopped for a traffic violation, um, there's some suspicious activity going on that I can't get into right now, so I'm checking with you first." *Id.* at 31:20-31. Jake told Sgt. Kober, "The best thing to do is tow the vehicle." *Id.* at 31:31-57. Although Jake observed that the renter was "irresponsible" and would be "in trouble" for allowing people not on the rental agreement to drive the vehicle, *id.*, it is simply not clear whether that was the reason for authorizing Sgt. Kober to tow the vehicle, because, for example, in the course of the conversation, Jake also said, "If they're doing something they're not supposed to do, you know, . . ." *Id.* at 32:00-47. There is no indication in this record nor is it a reasonable inference that, had Sgt. Kober not told Jake that "there's some suspicious activity going on that I can't get into right now," EAN Holdings would have asked that the vehicle be towed. Moreover,

if Sgt. Kober had been forthcoming to Jake about what Dean and Pope had told him about their friend Cari Rigdon renting the vehicle for them, and that they knew the vehicle had to be back in Georgia the next day, any suspicion about their activity in Jake's mind would have been virtually non-existent.

This is likely the reason Sgt. Kober's written report does not mention that he told Jake "some suspicious activity [was] going on"; rather, his report states only, "Sgt. Kober advised [Jake] they were speeding" in response to Jake's question about why he had stopped the SUV. Sgt. Kober's Report at 2. It also explains Sgt. Kober's failure to tell Jake that Pope and Dean had already told him about Cari Rigdon renting the vehicle and their knowledge of its return date. Also, at the hearing on this matter, defense counsel asked Sgt. Kober, "You wanted—you wanted to be able to do the inventory search. You wanted Jake to tell you that you were authorized to do the impoundment so that you could investigate your suspicions; right?" Sgt. Kober replied, "Yeah, I wanted to search the car or inventory the car." Transcript at 33:12-16. Also, at the hearing, I asked Sgt. Kober, "So if Jake had told you just let 'em go but tell them they have to have the car back tomorrow, if he had said that . . . what do you think you would have done?" and Sgt. Kober answered, "I would have had to explore other options, Your Honor." *Id*. at 53:23-54:4.[3] When I pressed him further by asking, "Are you telling me you probably wouldn't have just let them go?" Sgt. Kober answered, with admirable candor, "No, Your Honor. I wouldn't have let them go." *Id*. at 54:10-13.

---

[3] Sgt. Kober's answer continued, "I mean, I don't want to prolong the stop, but a K-9 is right there in Onawa. They have two of them. Obviously try to get consent, try to establish more probable cause. Obviously, there were some things that I should have seen that I didn't when I was up at the vehicle. And, you know, everything's a learning experience." Transcript at 54:4-9.

### 5. *Removal of the occupants*

After receiving Jake's authorization to tow the SUV, Sgt. Kober radioed dispatch to request a tow truck and stated that the reason for the tow was "request from Enterprise, EAN Holdings, third-party rental, renter not present, no additional drivers." Video at 33:20-39. Sgt. Kober then commented to his passenger, "It's going to get real interesting real quick." *Id*. at 33:52-55. Sgt. Kober and Trooper Farver approached the SUV, and, after a telephone call to the tow company, Sgt. Kober gave Pope a speeding ticket, but he did not give Davis a ticket for the firearm and gave no indication that he intended to do so. *See id*. at 34:29-36:45; Sgt. Kober's Report at 2. At just over thirty-six minutes after the stop, the officers returned to their vehicle, leaving Pope and Davis in the SUV. About one minute later, they returned to the SUV and explained that they had contacted EAN Holdings, and EAN had requested that the SUV be towed. The officers then asked Pope and Davis to get out of the SUV, patted them down, and asked them if there was anything else in the car, such as more guns. Sgt. Kober then explained to Pope and Davis that they were close to Onawa, but the officers could give them a ride shortly, and Pope and Davis apparently decided to wait, because Sgt. Kober directed them back to Trooper Farver's cruiser. *Id*. at 38:45-58.

Sgt. Kober's testimony about whether or not he would have allowed Pope and Davis to leave the scene on their own at this point was equivocal—or at least confusing:

> Q [By defense counsel]. So Mr. Pope and Mr. Davis go back to the patrol car. At that point if they had said either we're not going to go to your patrol car or if they had gotten out of the patrol car and left, what would you have done?
>
> A. I don't know.
>
> Q. You wouldn't have just let them go, would you?
>
> A. I had no reason to detain them at that point.

Q. Okay. So you would have let them walk back to Onawa?

A. If they wanted.

Q. This was at mile marker 113? Did I have that right?

A. 112 1/2 approximately probably, 112.3. I don't . . .

Q. And then Onawa's actually 112 if I remember right; is that correct?

A. It's right at the interchange.

Q. Okay. So Onawa was just right there.

A. Correct.

Q. All right. You didn't offer Mr. Davis or Mr. Pope the opportunity just to leave on their own, did you, at that point?

A. I told them we'd give them a ride to the motel.

Q. You didn't offer for them to have a taxi pick them up or anything like that? You were going to put them in the back of the patrol car instead?

A. Correct.

Transcript at 34:12-35:9. As mentioned, above, Sgt. Kober also testified that, if Jake had not given permission for the tow, he would not have just let Pope and Davis go. *Id*. at 54:10-13.

Although there is no dispute that Sgt. Kober had probable cause to stop the SUV for speeding, there is a dispute about whether he had probable cause for a search of the SUV, if EAN Holdings had not given him permission to tow the SUV, which required an inventory search. Sgt. Kober answered "yes" when asked if he felt he was in a good position, because of his experience, to make a quick call on whether or not probable cause exists to conduct a search. *Id*. at 26:17-21. He also agreed that searches based on probable cause are more common than inventory searches. *Id*. at 27:1-3. Later in his

testimony, he also agreed that the search conducted in this case was an inventory search, not a search based on probable cause. *Id*. at 38:15-25. He agreed that the vast majority of the items listed on a Property Control Inventory Report (PCIR), Defendant's Exhibit B, which listed only items taken from the SUV as evidence, indicated a vehicle/impound acquisition code, although the two cellphones seized from the SUV were identified with an acquisition code of "PC" for probable cause. *Id*. at 39:11-24. He testified, further, that the basis for his search of the SUV was "an inventory," and that there was nothing in his report or in the video to suggest that he was conducting a "probable cause" search. *Id*. at 38:15-25; *see also id*. at 47:22-48:8 (stating that there "possibly" was probable cause for the search, but that he conducted an inventory search pursuant to a request from EAN Holdings). There is no indication on the video that Trooper Farver ever suggested to Sgt. Kober or that Sgt. Kober ever suggested to Trooper Farver or his ride-along passenger that the officers had probable cause to search the SUV, either. Also, Sgt. Kober agreed that his only reason for impounding the rental vehicle was that the vehicle was wrongly or wrongfully possessed, the second reason for impoundment identified in the ISP Abandoned/Towed Vehicles Policy, Plaintiff's Ex. 1.

### 6. *The vehicle search and the arrests*

At approximately thirty-nine minutes after the stop, Sgt. Kober began his inventory search. Trooper Farver joined him about one minute later. Less than one minute after that, Sgt. Kober announced, "Here we go!" having discovered a glass pipe with methamphetamine residue under the driver's seat. *See id*. at 41:15; *see also* Transcript at 22:9-12 (explaining that he had found a "glass pipe, [which] [a]ppeared to have white residue and black on the pipe," and "[his] experience has been [that such pipes are] commonly used for smoking controlled substances."). The officers then interrupted their search to go place Pope and Davis under arrest and to handcuff them. Sgt. Kober confirmed in his testimony that, after discovering contraband in the SUV, he had probable

cause to continue searching the vehicle. Transcript at 48:9-15. Just over forty-two minutes after the stop, Pope and Davis were advised of their *Miranda* rights. Video at 42:53-43:38. According to his report, Sgt. Kober asked if they had anything else in the vehicle, and Davis admitted that there was "Ice and pot," and more specifically, "a lot" of "ice," "a couple ounces." Sgt. Kober's Report at 2. Further searching of the SUV produced methamphetamine, some marijuana, and some additional drug paraphernalia. *Id*. at 2-3.

At the suppression hearing, Sgt. Kober testified that he had conducted an inventory search of the SUV after EAN Holdings asked him to tow the vehicle, pursuant to a provision of the ISP Abandoned/Towed Vehicles Policy, Plaintiff's Ex. 1, which provides that an officer may impound a vehicle if the officer has reason to believe it is "wrongfully possessed" by the person having control of the vehicle. Transcript at 18:6-19:3. In Sgt. Kober's view, a rental vehicle is "wrongfully possessed," if an authorized driver is not present, even if the renter gave the occupants permission to use the vehicle, "because she [the renter] violated the contract she signed not to lend the vehicle to anybody unless they're listed as an additional driver or possessor of the vehicle." *Id*. at 62:19-63:3. On cross-examination, Sgt. Kober admitted that he would not have impounded a rental vehicle on the basis of other violations of the rental agreement, such as smoking in the rental car, or if the authorized driver was present in the vehicle, but another person was driving. *Id*. at 30:5-31:16. He testified that he didn't know if he would have done an impoundment or conducted an inventory search if the renter was not in the rental car, but was either following in another vehicle or in a nearby town. *Id*. at 31:17-32:2. He also explained that he made no effort to contact Cari Rigdon, after Pope and Davis identified her as the renter, because he "guess[ed]" it was fair to say he really didn't care where Ms. Rigdon was. *Id*. at 32:3-10. Whether Cari Rigdon gave Pope and Davis permission

to use the vehicle would have been relevant, however, to whether or not their possession of the vehicle was "wrongful," if permission from the renter created a bailment.

Sgt. Kober also testified that the ISP impoundment procedure requires a detailed or complete inventory on a vehicle towing and impound report (VTIR) of "all property in the vehicle including [a] list [of] all contents of each container in the vehicle." *Id*. at 19:25-20:3. He admitted, however, that he did not list "all items" found in the SUV, but all "[i]tems that I thought were of value," and that he did "[n]ot generally" list all incriminating and non-incriminating evidence. *Id*. at 21:7-15. The actual VITR in this case, Plaintiff's Exs. 2-3, was not turned over to the United States Attorney's Office until June 19, 2018, and was then disclosed to Davis shortly before the suppression hearing, but I find that the delay was owing to an oversight. At the time Davis filed his Motion To Suppress, he had received a different inventory list, identified as a Property Control Inventory Report (PCIR), Defendant's Exhibit B, which listed only items taken from the SUV as evidence. *See* Transcript at 24:5-25:12.

### 7.    *The statements during transport*

According to Sgt. Kober's report, Davis requested an attorney as of the day after his arrest. Sgt. Kober's Report at 4. The parties do not dispute that, on January 3, 2018, Tri-State Task Force Officers Todd Peterson and John Howard transported Davis from the Monona County Jail to the federal courthouse in Sioux City, Iowa, for his initial appearance and arraignment. Davis's attorney was not present during the transport. The parties also do not dispute that, during the transport, Officer Howard explained the procedure of the Federal system and what Davis could expect at the initial appearance, along with consideration of Davis's sentence if he decided to cooperate. *See* Officer Peterson's Report of Investigation, Defendant's Ex. D, 1. Davis then allegedly said that he would not cooperate against his source of supply, out of fear for himself and for the

safety of his family, but that he was receiving large quantities of methamphetamine. *Id.* at 1-2.

## B. Procedural Background

In an Indictment handed down December 20, 2017, Davis was charged with four offenses arising from the November 29, 2017, traffic stop.[4] **Count 1** charges Davis with conspiracy to distribute and possess with intent to distribute 50 grams or more of actual (pure) methamphetamine or 500 grams or more of a methamphetamine mixture, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. **Count 2** charges him with possession with intent to distribute 50 grams or more of actual (pure) methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A), and 18 U.S.C. § 2. **Count 3** charges him with possessing and carrying a firearm during and in relation to, and in furtherance of, a drug-trafficking crime, that is, conspiracy to distribute and possess with intent to distribute methamphetamine, and possession with intent to distribute methamphetamine, as charged in **Counts 1** and **2**, in violation of 18 U.S.C. §§ 2, 924(c)(1)(A), and 924(a)(2). **Count 4** charges him with possession of a firearm when he was an unlawful user of one or more controlled substances, that is, methamphetamine and marijuana, in violation of 18 U.S.C. §§ 922(g)(3), 942(a)(2), and 2.

On January 3, 2018, Davis pleaded not guilty to all the charges in the Indictment. Trial was eventually set in this matter before Chief Judge Leonard T. Strand to begin on September 10, 2018. On June 19, 2018, however, this case was reassigned to me for purposes of judicial economy.

On May 22, 2018, Davis filed the Motion To Suppress now before me. By Text Order filed June 14, 2018, a hearing on that Motion was set for June 29, 2018. On June

---

[4] Pope was not charged with federal offenses.

20, 2018, the prosecution filed its Resistance, and on June 27, 2018, Davis filed his Reply. On June 28, 2018, the prosecution filed a Supplemental Brief regarding the applicability of *Byrd v. United States*, 138 S. Ct. 1518 (2018), to the suppression issues in this case. At the hearing on June 29, 2018, the prosecution presented the testimony of Sgt. Kober and Special Agent John Howard, the case agent and a member of the Tri-State Task Force, and both parties submitted exhibits. At the conclusion of the hearing, I directed the parties to file separate proposed findings of fact and conclusions of law on or before July 20, 2018, and any replies to each other's submissions on or before August 2, 2018. The parties made those submissions by the specified deadlines.

I do not find further oral or written arguments are necessary. Therefore, this matter is now fully submitted.

## II. *LEGAL ANALYSIS*[5]

As a general matter,

> The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. In order to challenge evidence obtained in an unreasonable search, however, "[t]he defendant moving to suppress bears the burden of proving he had a legitimate expectation of privacy that was violated by the challenged search." *United States v. Muhammad*, 58 F.3d 353, 355 (8th Cir. 1995) (per curiam).

*United States v. Long*, 870 F.3d 792, 796 (8th Cir. 2017).

In his Motion To Suppress, Davis seeks suppression of evidence from two distinct incidents: (1) the stop and search of the SUV on November 29, 2017, and (2) any statements he made to task force officers on January 3, 2018, while the officers were

_____

[5] This legal analysis includes some further findings of fact.

transporting him to his initial appearance and arraignment. I will begin my analysis with Davis's challenge to the evidence obtained during the stop and search of the SUV.

## A. *The Stop And The Inventory Search*

The vehicle stop and the inventory search in this case present a number of more or less interrelated issues, some of which became apparent—and some of which were resolved—after Davis's Motion To Suppress was filed, in the course of the evidentiary hearing, and in post-hearing submissions. I will address the outstanding issues in what I believe is the logical order.

### 1. *Standing*

#### a. *Arguments of the parties*

In its proposed findings of fact and conclusions of law, submitted post-hearing, the prosecution first raised the "threshold matter" of Davis's standing to challenge any vehicle search. More specifically, the prosecution argues that Davis, who was only a passenger in the rental vehicle, did not have a property or possessory interest in the vehicle and lacks standing to challenge the search under Eighth Circuit precedent. The prosecution asserts that, even if Davis had contended that he received permission or consent from the lawful owner of the vehicle, EAN Holdings, or from the renter, Cari Rigdon, that argument would have been unavailing, because Davis offered no evidence, direct or indirect, that the owner or renter permitted him to drive the vehicle or otherwise exercise any possessory control over it, so he had no expectation of privacy that was violated by the challenged search.

Davis responds that the prosecution's argument that he lacks standing fails for two independent reasons. First, he argues that the prosecution has overlooked his challenge to the length and nature of his seizure by Sgt. Kober, and a passenger has standing to challenge any search that resulted from his seizure, if the seizure was unlawful. Second,

he argues that the prosecution is too quick to disregard the Supreme Court's decision in *Byrd v. United States*, 138 S. Ct. 1518 (2018). He argues that, in *Byrd*, the Supreme Court reiterated that its prior decision in *Rakas v. Illinois*, 439 U.S. 128 (1978), disclaimed any intent to hold that a passenger lawfully in a vehicle may not invoke the exclusionary rule to challenge a search of that vehicle, unless he happens to own or have a possessory interest in it. He also points out that *Rakas*, itself, indicated that a car occupant with an interest in property seized within the vehicle has standing to challenge the search of that property. Davis argues that the circumstances, here, show that he had a possessory interest in the contents of the vehicle, because he and Pope were on a cross-country trip, during which it would reasonably be expected that they would take turns driving; Cari Rigdon had rented the vehicle for both of them; he had personal belongings, including clothes, in the vehicle; the vehicle was not due back in Georgia for another day; and he expressly told Sgt. Kober that items in the vehicle belonged to him.

### b.     Analysis

Numerous decisions of the Eighth Circuit Court of Appeals recognize that "'[g]enerally, a mere passenger does not have standing to challenge a vehicle search where he has "neither a property nor a possessory interest in the automobile."'" *United States v. Russell*, 847 F.3d 616, 618 (8th Cir. 2017) (citing *United States v. Anguiano*, 795 F.3d 873, 878 (8th Cir. 2015), in turn quoting *Rakas*, 439 U.S. at 148); *accord, e.g., United States v. Marquez*, 605 F.3d 604, 609 (8th Cir. 2010); *United States v. Barragan*, 379 F.3d 524, 529-30 (8th Cir. 2004); *United States v. Green*, 275 F.3d 694, 698–99 (8th Cir. 2001). In *Russell*, the court observed that the defendant "was not an owner or registered user of the sedan and did not have a property interest in it." *Russell*, 847 F.3d at 618. The court also rejected the defendant's contention that he had a possessory interest because the sedan was rented by his girlfriend and allegedly operated at his request. *Id*. The court explained,

> A "defendant must present at least some evidence of consent
> or permission from the lawful owner/renter [of a vehicle] to
> give rise to an objectively reasonable expectation of privacy."
> *[United States v.] Muhammad*, 58 F.3d [353,] 355 [(8th Cir.
> 1995)]. Russell provides no evidence that his girlfriend
> permitted him to drive the sedan or otherwise exercise any
> possessory control over it. *Id*. (holding defendant lacked
> standing where he "presented no direct evidence that [the
> lawful renter] had granted him permission to use the
> vehicle"). Because he did not establish a reasonable
> expectation of privacy in the sedan, he has no standing to
> challenge the search. *See United States v. Macklin*, 902 F.2d
> 1320, 1330 (8th Cir. 1990) ("[T]o have a legitimate
> expectation of privacy by way of a possessory interest,
> defendant must have possession of the vehicle and the keys."),
> citing *United States v. Rose*, 731 F.2d 1337, 1343 (8th Cir.),
> *cert. denied*, 469 U.S. 931, 105 S.Ct. 326, 83 L.Ed.2d 263
> (1984).

*Russell*, 847 F.3d at 619; *see also Anguiano*, 795 F.3d at 878 (finding a passenger lacked
standing to challenge a vehicle search, even though he was in the vehicle for a long-
distance trip, because there was no evidence that he ever drove the vehicle; he lacked a
valid driver's license; even if he had driven the vehicle at some point, he provided no
evidence of the owner's consent or permission; and he did not know who the vehicle's
owner was, all of which led the court to conclude that the passenger had no expectation
of privacy).

I agree with the prosecution that Davis does not have standing to challenge the
search of the SUV, generally, on the basis of a possessory interest or expectation of
privacy in the SUV, even if he was traveling in it on a long-distance trip and even if he
allegedly had the permission of the renter, Cari Rigdon, to drive or possess it. As in
*Russell*, Davis has not presented any evidence that Cari Rigdon permitted him to drive
the SUV or otherwise exercise possessory control over it, apart from his and Pope's self-

serving statements that she did so. 847 F.3d at 619. As in *Anguiano*, Davis was involved in a long-distance trip in the SUV, but besides the lack of evidence of Cari Rigdon's permission, there is no evidence that Davis ever drove the vehicle, just inferences that it is possible that he did so, and he did not have a valid driver's license with him, which he likely would have, if he intended and had permission to drive the SUV. 795 F.3d at 878.

Whether Davis has standing to challenge the search of his personal property in the SUV is a very different question with a different answer. Numerous Circuit Courts of Appeals have held that a passenger has a reasonable expectation of privacy in a bag within a car. *See, e.g., United States v. Barber*, 777 F.3d 1303, 1305 (11th Cir. 2015) (a passenger in a car had standing to challenge the search of his bag, even if he lacked standing to contest the search of the car); *United States v. Iraheta*, 764 F.3d 455, 462 (5th Cir. 2014) (where neither passenger denied ownership of a duffle bag in the vehicle in which they were riding, they had not abandoned the bag, and had standing to challenge the search of the bag); *but see, e.g., United States v. Wise*, 877 F.3d 209, 222 n.9 (5th Cir. 2017) (a bus passenger's consent was not needed to search a backpack on the bus, where the passenger voluntarily disclaimed ownership of the backpack); *United States v. Tubens*, 765 F.3d 1251, 1256-57 (10th Cir. 2014) (a passenger on a bus did not have standing to challenge the search of a carry-on bag during an inventory search of the bus, where he had expressly and unequivocally disclaimed ownership of the bag). Here, Davis expressly asserted ownership of property in the vehicle, including his backpack, so that he retains standing to challenge the search of the backpack, even though he does not have standing to challenge the search of the vehicle, more generally, on the basis of a possessory interest in the vehicle. His standing extends only to the bag or other personal property in which he expressly asserted a property interest, however. *See Barber*, 777 F.3d at 1305. I note that, in this case, the first item of contraband discovered in the SUV was a glass pipe under the driver's seat, not under the passenger's seat, where Davis was

sitting. That glass pipe also was not in any container or bag over which Davis did or could claim any property or privacy interest.

Ultimately, however, I conclude that Davis *does* have standing to challenge all the evidence discovered in the SUV based on his challenge to the length and nature of his personal seizure by Sgt. Kober. As the Supreme Court explained in *Brendlin v. California*, 551 U.S. 249 (2007), a passenger is seized during a traffic stop and may, therefore, challenge the stop itself. *See also United States v. Arnold*, 835 F.3d 833, 837 n.6 (8th Cir. 2016) ("As a threshold issue, Defendant correctly points out that he may challenge the constitutionality of the May 15, 2014 vehicle stop as a mere passenger." (citing *Brendlin*, 551 U.S. at 255-57)); *United States v. Crippen*, 627 F.3d 1056, 1063 (8th Cir. 2010) ("While *Brendlin* held that a passenger is seized for Fourth Amendment purposes during a traffic stop and thus may challenge it, *id*. at 255, 259, 127 S.Ct. 2400, here Crippen challenges the search of the truck, not the traffic stop.").

As the Eighth Circuit Court of Appeals has explained, "A constitutionally permissible traffic stop can become unlawful, however, 'if it is prolonged beyond the time reasonably required to complete' its purpose." *United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). In *Peralez*, the defendant "was charged with one count of possessing a firearm with an obliterated serial number after a South Dakota State Patrol trooper found such a firearm in [the defendant's] luggage in a van in which [the defendant] was a passenger." 526 F.3d at 1117. The court determined that the stop had been unlawfully extended, thus violating the passenger's Fourth Amendment right to be free from unreasonable seizures, but the court observed that conclusion did not end the inquiry. *Id*. at 1121. Rather, the court found that it "must determine whether the constitutional violation caused [the officer] to obtain the challenged evidence," because "[o]nly if the constitutional violation was 'at least a but-for cause of obtaining the evidence' is suppression of evidence the

appropriate remedy." *Id.* (quoting *United States v. Olivera–Mendez*, 484 F.3d 505, 511 (8th Cir.2007)). Thus, Davis has standing to challenge any allegedly unlawful extension of the stop and to seek suppression of any evidence that was seized as a result of the improper extension. *Id.*

I conclude that Davis has standing to challenge any evidence obtained from the search of the SUV, *provided* that he establishes that the stop was improperly extended and that the improper extension resulted in the seizure of that evidence.

### 2.   *Applicability of* **Byrd**

#### a.   **The decision in** **Byrd**

Before the evidentiary hearing on Davis's Motion To Suppress, I advised the parties by email that I was interested in briefing on the applicability of the Supreme Court's recent decision in *Byrd v. United States*, 138 S. Ct. 1518 (2018). In *Byrd*, the Supreme Court granted the defendant's petition for a writ of *certiorari* to address the conflict among the Circuit Courts of Appeals over whether an unauthorized driver has a reasonable expectation of privacy in a rental car. 138 S. Ct. at 1526. The Court held as follows:

> Though new, the fact pattern here continues a well-traveled path in this Court's Fourth Amendment jurisprudence. Those cases support the proposition, and the Court now holds, that the mere fact that a driver in lawful possession or control of a rental car is not listed on the rental agreement will not defeat his or her otherwise reasonable expectation of privacy.

*Byrd*, 138 U.S. at 1531. The Court also left two questions for the Third Circuit Court of Appeals to address on remand: (1) whether one who intentionally uses a third party to procure a rental car by a fraudulent scheme for the purpose of committing a crime is no better situated than a car thief; and (2) whether probable cause justified the search in that case in any event. *Id.*

### b.    *Arguments of the parties*

In a supplemental brief to address the applicability of *Byrd*, the prosecution argues that *Byrd* does not apply to the facts of this case.  First, the prosecution argues, Davis was not the driver of the rental car, and nothing in *Byrd* suggests that the Court intended its holding to extend to passengers.  Second, the prosecution argues, the facts surrounding the officers' discovery of contraband were markedly different in the two cases.  The prosecution argues that Sgt. Kober had called EAN Holdings to determine whether the driver, Pope, or Davis, the passenger, could lawfully possess the vehicle, and EAN had directed Sgt. Kober to tow the vehicle, but the officers in *Byrd* immediately conducted a probable cause search without contacting the rental company.  The prosecution also points out that *Byrd* is distinguishable, because the driver in that case produced the rental agreement, but Pope and Davis did not.  The prosecution argues that the fact that a violation of the rental agreement is not a criminal matter oversimplifies the facts and conflates the issues, where Sgt. Kober towed the vehicle at the request of the lawful owner.  Third, the prosecution argues, *Byrd* is irrelevant when officers conduct a valid warrantless search under the "automobile exception" based on probable cause.  The prosecution argues, here, in the alternative, that Sgt. Kober did have probable cause to search the vehicle.

In his proposed findings of fact and conclusions of law, Davis argues that one question left open in *Byrd* is relevant, here, because Cari Rigdon's transfer of possession of the rental vehicle to Pope and Davis was a second bailment.  He also argues that courts have recognized that unauthorized rental car occupants, as second bailees, have a possessory interest in the rental vehicle.  He argues that *Byrd* also suggests that there are limited scenarios in which a second bailee's possession may be deemed "wrongful," and no such scenario was present, here.  He argues that there is no showing that his and Pope's possession of the rental car, as second bailees, constituted "wrongful"—that is,

illegal—possession or that Sgt. Kober had any reasonable basis to conclude that their possession was "wrongful," rendering his impoundment and inventory search of the vehicle unconstitutional. In his reply to the prosecution's proposed findings of fact and conclusions of law, Davis also argues that *Byrd* is relevant, here, to the extent that it reiterates that *Rakas v. Illinois*, 439 U.S. 128 (1978), "disclaimed any intent to hold 'that a passenger lawfully in an automobile may not invoke the exclusionary rule and challenge a search of that vehicle unless he happens to own or have a possessory interest in it.'" *Byrd*, 138 S. Ct. at 1528 (quoting *Rakas*, 439 U.S. at 149 n.17). Davis argues that *Rakas*, 439 U.S. at 148, in turn, indicated that a car occupant with "an interest in the property seized" within the car has standing to challenge the seizure.

### c.    *Analysis*

I agree with the prosecution that, in *Byrd*, the Supreme Court did not *decide* any issue dispositive here, despite the fact that *Byrd*, like this case, involved occupants (a single occupant in *Byrd*) of a rental vehicle who were not authorized drivers under the rental agreement. Again, the precise question that the Court addressed in *Byrd* was whether an unauthorized driver has a reasonable expectation of privacy in a rental car. 138 S. Ct. at 1526. The Court's focus in *Byrd* remained on the defendant's status as an unauthorized driver. Here, the driver was Pope, not Davis.

Specifically, in *Byrd*, the Court explained, "Answering that question [whether an unauthorized driver has a reasonable expectation of privacy in a rental car] requires examination of whether the person claiming the constitutional violation had a legitimate expectation of privacy in the premises searched." *Id*. (internal quotation marks and citation omitted). Although the Court observed that expectations of privacy need not be based on property interests, property interests were instructive on the extent of privacy interests under the Fourth Amendment. *Id*. The Court's explanation that property interests are instructive on the extent of privacy interests under the Fourth Amendment

is a principle generally applicable to all search and seizure cases, but it provides no specific insight to the resolution of Davis's motion regarding specific circumstances.

In *Byrd*, the Court also concluded that "presence on the premises" was "too broad a gauge" to measure Fourth Amendment rights. *Id.* at 1527. Thus, *Byrd* is instructive in Davis's case for the general proposition that mere "presence" in the rental vehicle is "too broad a gauge" to measure a Fourth Amendment violation. On the other hand, the Court rejected the government's position that only authorized drivers of rental cars have expectations of privacy in rental vehicles as based on a faulty premise and as irrelevant, where the defendant was not a passenger, but the driver and sole occupant of the rental car. *Id.* at 1528-29. Again, this point is unrelated to Davis's situation as the passenger in the rental vehicle.

Next, the Court rejected the government's argument that the defendant's driving the rental car violated the rental agreement that the renter had signed, and that this violation meant the defendant could not have had any basis for claiming an expectation of privacy in the rental car at the time of the search, because the violation did not "void" the agreement, and there might be "countless innocuous reasons why an unauthorized driver might get behind the wheel of a rental car and drive it." The Court concluded that this might be a serious breach of the rental agreement, but had no bearing, standing alone, on expectations of privacy in the car. *Id.* at 1529. Thus, *Byrd* is instructive, here, to the extent that it suggests that a mere violation of a rental agreement does not deprive an unauthorized driver of a rental vehicle—and by reasonable extension, his or her passenger—of a protectable expectation of privacy in the vehicle. Again, this is only a general proposition that is not dispositive of this case. The Court's ultimate holding in *Byrd*, "that the mere fact that a driver in lawful possession or control of a rental car is not listed on the rental agreement will not defeat his or her otherwise reasonable expectation of privacy," *id.* at 1531, is instructive, here, to the extent that it demonstrates

that "lawful possession or control of a rental vehicle" does not depend upon whether or not the driver is an authorized under the rental agreement, for reasons that I will explain, below.

Finally, Davis points out that the Supreme Court in *Byrd* raised the question of whether occupants of a rental car with permission from the renter would be considered second bailees with a common-law property interest in the rental car that would have provided the occupants with a cognizable Fourth Amendment interest in the vehicle. The Court expressly declined to reach that argument, however, because it was not raised below. *Id*. at 1526-27. Even though I have determined, on other grounds, that Davis does have standing to challenge the stop and any search resulting from an improper extension of that stop, I will address, below, at least briefly, the question of Davis's potential status as a second bailee.

Therefore, I conclude that *Byrd*, while not irrelevant, ultimately is not dispositive of this case.

### 3.     *The inventory search*

Davis argues that Sgt. Kober's purported inventory search was constitutionally flawed on two grounds: (1) the search was pretextual because it failed to follow any reasonable protocol; and (2) the search followed an improperly extended stop that was commenced for a simple speeding violation. As I explained, above, in Section II.A.1., Davis was a passenger in the SUV, so that he only has standing to challenge any allegedly unlawful extension of the stop, not the search itself, although he does have standing to seek suppression of any evidence that was seized as a result of the improper extension of the stop. *See Peralez*, 526 F.3d at 1121. Similarly, just as an inventory search may not be used as a pretext for a search for which the sole motive is really investigatory, *see, e.g., United States v. Ball*, 804 F.3d 1238, 1241 (2015); *United States v. Evans*, 781 F.3d 433, 437 (8th Cir. 2015), it follows that an inventory search cannot be used as a

pretext to prolong a stop for which the sole motive has become investigatory. To put it another way, a pretextual inventory search results in an improper extension of the stop. Therefore, I will consider both of Davis's arguments.

> **a.** **_Pretext and failure to follow protocol_**
>
> **i.** **_Arguments of the parties_**

The parties' arguments concerning the issues of pretext and adherence to a reasonable protocol underwent some metamorphoses as new information became available prior to and during the evidentiary hearing. In his opening brief, Davis argues that the prosecution cannot justify the search of the SUV, because it does not appear that the inventory complied with any conceivable standardized policy. Specifically, he argues that Sgt. Kober described only incriminating or potentially incriminating items in the inventory list in his report and in the PCIR. He points out that the inventory list did not include other, non-incriminating items, such as a pair of jeans, a belt, a baseball cap, an unopened pack of Gildan boxer briefs, a button-up shirt, various markers or pens inside of the gray backpack, and other items. He argues that failure to comply with a departmental policy requiring a detailed and complete list of items located in the vehicle raises an inference that Sgt. Kober used the inventory search as a purposeful and general means of discovery of evidence of a crime, making the search improper.

Davis identifies other bases for a conclusion that the inventory search was a pretext for a search for evidence of criminal activity. He points out that Sgt. Kober's report reveals that he was suspicious of Pope and Davis before any search, and before obtaining permission from EAN Holdings to tow the vehicle, because Pope pulled over onto the inside shoulder of the interstate; Pope and Davis did not have the rental agreement in the car; Davis's firearm was in the back seat; Pope was nervous; and Pope had plastic baggies in his backpack. Davis also points out that the video shows that, before the search, Sgt. Kober articulated his hunches about Pope and Davis being engaged in criminal

conduct several times. Davis argues that it was only after articulating these hunches that Sgt. Kober called EAN Holdings to try to obtain permission to tow the vehicle, and when he did so, he primed the representative by stating, "there's some suspicious activity going on that [he couldn't] get into right now," rather than simply stating that he had stopped the vehicle for speeding.

The prosecution responded to Davis's contention that Sgt. Kober did not follow any reasonable protocol for the search by belatedly producing Sgt. Kober's original VITR, which listed non-incriminating as well as incriminating evidence in the vehicle. I concluded, above, that the VITR was not originally produced as the result of an oversight. Based on that disclosure, the prosecution argues in its resistance brief that Sgt. Kober's inventory report complied with the ISP Abandoned/Towed Vehicles Policy, which requires a detailed inventory listing of incriminating and non-incriminating items found in the vehicle. The prosecution also argues that officers are not precluded from conducting an inventory search of a lawfully impounded vehicle, even if they suspect that the driver is involved in illegal activity, as long as their sole purpose for the search is not to investigate crime.

Although Davis shifts the focus of his reply argument that Sgt. Kober failed to adhere to any reasonable protocol, in light of the prosecution's disclosure of the VITR, that argument does not disappear. Davis argues that the VITR does not confirm that Sgt. Kober followed standardized procedure in this case, because the purported inventory search was quite obviously pretextual. This is made clear, he argues, by the record showing that Sgt. Kober conducted the search because he felt that Pope and Davis were "up to no good." Davis argues that the unusual timing of the disclosure of the VITR should also be considered.

In his proposed findings of fact and conclusions of law, Davis argues that the inventory search of the SUV was pretextual, because Sgt. Kober improperly used

28

impoundment as a purposeful and general means of discovering evidence of a crime. He adds to his prior arguments that Sgt. Kober did not disclose to EAN Holdings that Pope had already truthfully explained that Cari Rigdon had rented the vehicle for them, which would have led to the inference that she consented to their possession, he suggested to the representative that criminal activity was ongoing, and he admitted at the hearing that he would not have just let Pope and Davis drive away if the representative had not requested that the SUV be towed. Davis also argues that Sgt. Kober did not comply with the ISP Abandoned/Towed Vehicles Policy, because an objectively reasonable officer would not have believed that the Policy allows impoundment of any rental vehicle in every instance in which an authorized driver is not present, because the occupants' possession was not illegal. Davis argues that a reasonable officer would have investigated the transfer from Cari Rigdon to Pope and Davis, but Sgt. Kober did not.

In its reply to Davis's proposed findings of fact and conclusions of law, the prosecution reiterates its position that Sgt. Kober lawfully impounded the SUV, in compliance with the ISP Abandoned/Towed Vehicles Policy. The prosecution asserts that EAN Holdings authorized the tow, because the SUV was wrongfully possessed by Pope and Davis. The prosecution also reiterates that after Sgt. Kober obtained permission to tow the SUV, he completed a detailed inventory as required by the ISP Abandoned/Towed Vehicles Policy. The prosecution also argues that Sgt. Kober's suspicion of criminal activity does not equate to pretext for the inventory search, because his suspicions were not the only reason for the original stop or the search.

### ii. Analysis

As the Eighth Circuit Court of Appeals has explained,

> "It is 'well-settled' law that 'a police officer, after lawfully taking custody of an automobile, may conduct a warrantless inventory search of the property to secure and protect vehicles and their contents within police custody.'" *United States v.*

> *Williams*, 777 F.3d 1013, 1015 (8th Cir. 2015) (quoting
> *United States v. Rehkop*, 96 F.3d 301, 305 (8th Cir. 1996)).

*United States v. Perez-Trevino*, 891 F.3d 359, 366 (8th Cir. 2018). Furthermore,

> "The police are not precluded from conducting inventory
> searches when they lawfully impound the vehicle of an
> individual that they also happen to suspect is involved in
> illegal activity." *United States v. Pappas*, 452 F.3d 767, 771
> (8th Cir. 2006) (quoting *United States v. Marshall*, 986 F.2d
> 1171, 1175–76 (8th Cir. 1993)).

*Perez-Trevino*, 891 F.3d at 366.

Nevertheless, "[a]n inventory search 'must be reasonable in light of the totality of the circumstances.'" *United States v. Ball*, 804 F.3d 1238, 1241 (8th Cir. 2015) (quoting *United States v. Beal*, 430 F.3d 950, 954 (8th Cir.2005)). "The reasonableness requirement is met when an inventory search is conducted according to standardized police procedures, which generally remove the inference that the police have used inventory searches as a purposeful and general means of discovering evidence of a crime." *United States v. Smith*, 715 F.3d 1110, 1117 (8th Cir. 2013) (quotation and citation omitted)). First, the inventory policy, itself, must contain "sufficient standardized procedures for [the officer] to inventory the contents of the vehicle and its compartments." *Perez-Trevino*, 891 F.3d at 366. Second, "[t]he search 'must comply with [those] "standardized police procedures.'" *Id.* (quoting *Williams*, 777 F.3d at 1016, in turn quoting *United States v. Mayfield*, 161 F.3d 1143, 1145 (8th Cir. 1998)). For example, the search must not exceed the scope authorized by the policy. *Ball*, 804 F.3d at 1241 (considering whether the scope of the search, including the air filter box in the engine compartment, was within the standard procedure for an inventory search by the Illinois state policy). On the other hand, "[n]othing 'prohibits the exercise of police discretion so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity.'" *United States*

*v. Harris*, 795 F.3d 820, 822 (8th Cir. 2015) (quoting *Colorado v. Bertine*, 479 U.S. 367, 375 (1987)).

The inventory search also "may not be 'a ruse for a general rummaging in order to discover incriminating evidence.'" *United States v. Taylor*, 636 F.3d 461, 464 (8th Cir. 2011) (quoting *Florida v. Wells*, 495 U.S. 1, 4 (1990)). More specifically,

> Officers "may not raise the inventory-search banner in an after-the-fact attempt to justify what was … purely and simply a search for incriminating evidence," but they are permitted to "keep their eyes open for potentially incriminating items that they might discover in the course of an inventory search, as long as their sole purpose is not to investigate a crime." *United States v. Beal*, 430 F.3d 950, 954 (8th Cir.2005).

*Ball*, 804 F.3d at 1241 (ultimately concluding that there was no evidence that the search at issue was "pretextual"). "'Something else must be present to suggest that the police were engaging in their criminal investigatory function, not their caretaking function, in searching the defendant's vehicle.'" *Harris*, 795 F.3d at 822 (quoting *Taylor*, 636 F.3d at 465).

> In *Taylor*, that "something else" was the officer's admission that the *sole* basis for the traffic stop, arrest, towing and inventory search was her belief that the vehicle contained narcotics. *See id*. Here, Harris claims only that the police were motivated *in part* by the desire to search for evidence. An inventory search that follows standard police procedures is generally not a pretext to illegally obtain evidence. *See id*. at 464; *Pappas*, 452 F.3d at 771 ("[a]n inventory search by police prior to the impoundment of a vehicle is generally a constitutionally reasonable search").

*Harris*, 795 F.3d at 822–23. In *Harris*, the court found nothing to suggest that the search was pretextual, because the defendant had been taken into custody, his car was a hazard to other vehicles, and the inventory of items in the vehicle was not inadequate. *Id*. at

823.  On the other hand, in *Taylor*, on which Davis originally relied in this case, the court found that the officers had not complied with the Kansas City Police Department's "standardized procedures," which required the officers to create a detailed, itemized inventory when any vehicle is towed, where the officers had listed hundreds of valuable tools in the defendant's truck simply as "misc. tools." The court concluded this failing gave rise to an inference that the search was investigatory, not really for purposes of an inventory. *Taylor*, 636 F.3d at 464-65.

Here, I conclude, in light of the totality of the circumstances, that Sgt. Kober's decision to conduct an inventory search was not reasonable. *Ball*, 804 F.3d at 1241. The failure to comply with the requirements of a reasonable inventory search leaves an inference that Sgt. Kober's purported inventory search was really used as a purposeful and general means of discovery of evidence of a crime. *Cf. Smith*, 715 F.3d at 1117. In addition, there was "something else," in fact, several other things, that suggest "that the police were engaging in their criminal investigatory function, not their caretaking function, in searching the defendant's vehicle." *Harris*, 795 F.3d at 822 (internal quotation marks and citations omitted).

Davis's original challenge was based on the lack of a properly detailed inventory, which he argued suggested failure to comply with ISP procedures or protocols. When a more detailed inventory, prepared at or shortly after the search, was belatedly produced, Davis refocused on the lack of authorization for the inventory search in the applicable ISP policy. I conclude that the ISP Abandoned/Towed Vehicle Policy, like the Kansas City Police Department's policy's inventory procedure at issue in *Perez-Trevino*, contained "sufficient standardized procedures for [the officers] to inventory the contents of the vehicle and its compartments." 891 F.3d at 366 (first requirement of an adequate inventory procedure is sufficiency of the standardized policies). Not only does that Policy adequately define circumstances in which impoundment and inventory are authorized,

and proper procedures to do so, *see* Plaintiff's Ex. 1 at 1-3, it adequately states the requirements of the inventory. *Id*. at 4;[6] *and compare Perez-Trevino*, 891 F.3d at 366

---

[6] In pertinent part, the Policy provides, as follows:

    1. Prior to towing an impounded vehicle, the officer shall

    * * *

        c) Complete TraCS Form-Vehicle Towing and Inventory Report, to include:

        * * *

            (4) a detailed inventory.

                (a) Complete an inventory of all property in the vehicle.

                (b) The inventory shall include a list of the contents of each container in the vehicle. Each container shall be opened unless the contents of a particular container are evident from its exterior.

                (c) If keys, a locksmith, or other means of access are not reasonably available to the officer, the officer is authorized to break locks to gain access to the vehicle and its locked compartments. (Supervisory permission is needed before a locksmith is obtained or locks are broken.)

                (d) The inventory is a record which is intended for use in ensuring the safe return of the lawful possessor's property and resolving questions regarding the condition or contents of the vehicle.

ISP Abandoned/Towed Vehicle Policy, Plaintiff's Ex. 1 at 4.

(quoting the KCPD policy, which stated, in part, "The officer performing the inventory will conduct a thorough and uniform inventory of the vehicle and its compartments").

Sgt. Kober did not strictly comply with those "standardized police procedures," however. *See id.* (the second requirement is that the officer's search "must comply with [those] 'standardized police procedures'" (citation omitted)). First, at the hearing, Sgt. Kober agreed that the ISP impoundment procedure requires a detailed or complete inventory, on a vehicle towing and impound report (VTIR), of "all property in the vehicle including [a] list [of] all contents of each container in the vehicle." *Id.* at 19:25-20:3. He admitted, however, that he did not list "all items" found in the SUV, but only "[i]tems that I thought were of value," and that he did "[n]ot generally" list all incriminating and non-incriminating evidence. *Id.* at 21:7-15. This is plainly not as egregious a departure from the required detail of the itemization as the one in *Taylor*, where the officers had listed hundreds of valuable tools in the defendant's truck simply as "misc. tools"—and may even reflect a certain systemic laxity in compliance with the Policy—but it does give rise to some inference that the search was investigatory, not really for purposes of an inventory. *Taylor*, 636 F.3d at 464-65.

What provides a stronger inference of pretext arising from non-compliance with an applicable policy or procedure is that I cannot find that the ISP Abandoned/Towed Vehicle Policy authorized impoundment and an inventory search in the circumstances presented, here. That Policy authorizes impoundment, *inter alia*, where "[a]n officer has reason to believe [vehicles] are wrongfully possessed by the person having control of such vehicles." Plaintiff's Ex. 1 at 2 (Policy IV.A.2.).[7] Sgt. Kober's (and the

---

[7] Another provision of the Policy, IV.A.4., authorizes impoundment if "[a]n officer has reason to believe [the vehicles] are being used to transport contraband," but neither Sgt. Kober nor the prosecution relied on this provision, and I conclude that any belief Sgt. Kober had that the SUV was being used to transport contraband was not

prosecution's) contention that the SUV was "wrongfully possessed," because Pope and Davis were not authorized drivers on the rental agreement, is unavailing. First, I agree with Davis that the more reasonable reading of "wrongfully possessed" is not just "possessed in violation of a rental agreement," but illegally possessed. Second, although it was decided after the incident at issue, here, the Supreme Court's decision in *Byrd* suggests that there is a clear distinction between possession of a rental vehicle that is not "authorized" by the rental agreement and possession that is sufficiently "wrongful" to warrant depriving the driver of possession of the rental vehicle. Specifically, the Court held "that the mere fact that a driver in lawful possession or control of a rental car is not listed on the rental agreement will not defeat his or her otherwise reasonable expectation of privacy." *Byrd*, 138 U.S. at 1531. The Court also recognized that there might be "countless innocuous reasons why an unauthorized driver might get behind the wheel of a rental car and drive it," and, although an unauthorized driver might be a serious breach of the rental agreement, it had no bearing, standing alone, on expectations of privacy in the rental car. *Id*. at 1529.

Furthermore, Sgt. Kober made no attempt to investigate Pope's and Davis's claim that Cari Rigdon, the renter, had given them permission to use the SUV. Rigdon's permission would have established a second bailment under Georgia law,[8] which constituted *lawful* possession of the SUV—and also established related privacy and property rights limiting Fourth Amendment searches and seizures. In *Hall v. State*, 477

sufficiently reasonable or strong to permit impoundment, for reasons addressed in the body.

[8] The question of whether a second bailment was created is necessarily one of Georgia law, where the vehicle was originally rented and permission for Pope and Davis to use it was purportedly given. Otherwise, the validity of a second bailment would depend entirely on the happenstance of the state through which the rental vehicle was traveling at any particular time.

S.E.2d 364 (Ga. Ct. App. 1996), the Georgia Court of Appeals held that a driver's use of a rental vehicle with the renter's permission, even though he was not listed as an authorized driver on the rental agreement, "created a bailment," so that the driver had "standing to complain of a search," but that standing "extended only so long as he was in possession of the car." 477 S.E.2d at 366. Here, Pope and Davis claimed to have the renter's permission and they retained possession of the SUV. Thus, their standing as second bailees might have established their standing to challenge the search, but certainly would have established their standing as *lawful* possessors of the SUV. Sgt. Kober unreasonably failed to make any effort to determine whether Pope and Davis had the renter's permission to drive the rental SUV before deciding that their possession of the rental SUV was "wrongful."

Thus, Sgt. Kober's conclusion that the "wrongful possession" provision of the ISP Abandoned/Towed Vehicle Policy authorized impoundment and an inventory search was unreasonable and did not comply with that Policy.

In this case, there is also "something else" that suggests—indeed, convinces me— "that the police were engaging in their criminal investigatory function, not their caretaking function, in searching the defendant's vehicle." *Harris*, 795 F.3d at 822 (internal quotation marks and citations omitted). That "something else" is the circumstances that led to the inventory search, which convince me that the purported inventory search was "'a ruse for a general rummaging in order to discover incriminating evidence.'" *Taylor*, 636 F.3d at 464 (quoting *Wells*, 495 U.S. at 4). If an officer "'may not raise the inventory-search banner in an after-the-fact attempt to justify what was . . . purely and simply a search for incriminating evidence,'" *Ball*, 804 F.3d at 1241 (quoting *Beal*, 430 F.3d at 954), an officer certainly cannot raise the "inventory-search banner" from the start in an attempt to justify what is purely and simply intended as a search for incriminating evidence. That is what happened, here, however.

I find that Sgt. Kober had decided to search the vehicle to investigate his hunch that Pope and Davis were "up to no good" or in possession of "dope," which he first articulated about thirteen minutes after stopping the SUV and before he had any reply from dispatch about the identity or criminal histories of the occupants of the SUV or the status of the "nine millimeter." *See* Video at 13:02-16:12; Transcript at 34:7-10. Indeed, just over eighteen minutes after stopping the SUV, still before Sgt. Kober had complete information from dispatch, without making any attempt to contact Cari Rigdon, and before any contact with EAN Holdings, Sgt. Kober had already decided to do an inventory search. It was at that time that he announced to his passenger that he would "call EAN Holdings and see if they want it [the SUV], and then I'll do my inventory." *Id*. at 19:01-19:07. Sgt. Kober continued to pursue his plan to conduct an "inventory search" despite the fact that, by twenty-five minutes into the stop—and before reaching anyone at EAN Holdings—Sgt. Kober knew that Pope and Davis had only misdemeanor charges in the past, but neither Pope nor Davis had any felony convictions, *id*. at 15:10-35; Transcript at 28:14-18; Sgt. Kober's Report at 1; had confirmation that the SUV was rented from "EAN Holdings out of Augusta, Georgia," Video at 21:22-30; knew that the gun had not been reported stolen, Transcript at 28:19-25; and knew that Pope had a "driving under the influence (DUI) alcohol/drug" charge in 2010, but no similar charges more recently. Video at 24:55-25:12.

I find that, when Sgt. Kober did contact EAN Holdings, he also manipulated the conversations to obtain the desired permission to tow the SUV and conduct a purported inventory search. In his conversation with Jake at EAN Holdings, Sgt. Kober feigned ignorance of several details and emphasized others which might have suggested to Jake that he should authorize a tow, even if he was not inclined to do so on the basis of a violation of the authorized driver provision of the rental agreement. Sgt. Kober did not disclose that he already knew Cari Rigdon was the renter and that the SUV was due back

in Georgia the next day; instead, he asked who the renter was and about the rental dates. Video at 27:29-53. From the start, Sgt. Kober seems to me to suggest to Jake (and to Carol, the first EAN Holdings representative he spoke to) that Pope and Davis should not be allowed to continue back to Georgia with the SUV by repeatedly asking "what [EAN Holdings] want[ed] done with" the SUV. *Id*. at 26:20-38; id. at 27:29-53; *id*. at 31:10-14. Jake did not immediately take the hint, but asked, "Why were they stopped, if you don't mind me asking?" *Id*. at 31:14-20. This response strongly suggests that Jake did not view violation of the rental agreement, standing alone, as sufficient to interfere with allowing Pope and Davis to return the SUV as scheduled.

In my view, Sgt. Kober then gave a reply intended to prime Jake further to get the response that Sgt. Kober wanted by stating, "[T]here's some suspicious activity going on that [he couldn't] get into right now," rather than simply stating that he had stopped the vehicle for speeding. *Id*. at 31:20-31. I acknowledge that Jake observed that the renter was "irresponsible" and would be "in trouble" for allowing people not on the rental agreement to drive the vehicle, *id*. at 31:31-57, but I cannot find that was the only reason that Jake authorized the tow, where the suggestion of illegal activity also played a significant part, in light of Jake's question about why the vehicle was stopped and his further comment, in the course of his conversation with Sgt. Kober, "If they're doing something they're not supposed to do, you know, . . ." *Id*. at 32:00-47. I reiterate my findings that there is no indication in this record nor is it a reasonable inference that, had Sgt. Kober not told Jake that "there's some suspicious activity going on that I can't get into right now," Jake would have asked that the vehicle be towed. Also, I reiterate that, if Sgt. Kober had been forthcoming to Jake about what Dean and Pope had told him about their friend Cari Rigdon renting the vehicle for them, and that they knew the vehicle had to be back in Georgia the next day, any suspicion about their activity in Jake's mind would have been virtually non-existent.

There is a further inference that the intent of the search was investigatory, from the start, because of Sgt. Kober's conspicuous omission from his report of any mention that he told Jake that "some suspicious activity [was] going on," and inclusion of only "Sgt. Kober advised [Jake] they were speeding" in response to Jake's question about why he had stopped the SUV. Sgt. Kober's Report at 2. Finally, at the hearing, Sgt. Kober actually admitted that his purpose was an investigatory search, not an inventory one, because he admitted on cross-examination, "Yeah, I wanted to search the car or inventory the car," Transcript at 33:12-16, and he admitted to me that, if Jake had not authorized him to tow the vehicle, he "would have had to explore other options," *id*. at 53:23-54:4, and that he "wouldn't have let them go," *id*. at 54:10-13. Indeed, Sgt. Kober moved the occupants from the SUV to Trooper Farver's cruiser with the promise of a ride to Onawa shortly, but never offered to call them a taxi or anything else. Transcript at 34:12-35:9.

I conclude that the inventory search, here, was a pretext for a search the sole purpose of which was to investigate crime. *Bell*, 804 F.3d at 1241.

### b.    *Improper extension of the stop*
#### i.    *Arguments of the parties*

Davis also argues that the search was the result of an unlawful extension of the stop. He points out that nearly forty minutes elapsed between the point at which Sgt. Kober stopped the SUV for speeding and the point at which he initiated his purported inventory search. Davis argues that, during that entire period, he and Pope were not free to leave, because Sgt. Kober was extending the stop to find a way to do a purported inventory search to look for incriminating evidence, based on his hunches. He argues, however, that the proper "mission" of the traffic stop was the speeding ticket, not the improper extension of the traffic stop to obtain permission from the rental company to tow the vehicle and thereby conduct an inventory search.

The prosecution argues that Sgt. Kober did not impermissibly extend the traffic stop, because Sgt. Kober asked Pope and Davis routine questions, including requesting licenses and vehicle registration, and asking Pope and Davis about their destination, route, and purpose. The prosecution contends that, through these routine inquiries, Sgt. Kober learned that the vehicle was a rental, neither occupant had the registration or rental agreement for the vehicle, and, in fact, neither party had actually rented the vehicle, but a friend who was not present had. The prosecution argues that, at this point, Sgt. Kober had reason to believe that Pope and Davis "wrongfully possessed" the vehicle, which was a ground for impoundment under the ISP Abandoned/Towed Vehicles Policy, so that he could reasonably extend the stop to call EAN Holdings to confirm matters relating to the rental. In short, the prosecution contends, Sgt. Kober's "minimally prolonged traffic stop" was legitimate and did not violate Davis's Fourth Amendment rights.

In his reply brief, Davis reiterates his argument that the stop was unlawfully extended, because a person not listed on a rental agreement may still be in lawful possession of a rental vehicle, but Sgt. Kober conducted no reasonable inquiry to determine whether Pope and Davis had taken the rental car from Cari Rigdon with or without her consent. Davis argues that police cannot extend a traffic stop simply to determine whether someone has violated a rental car agreement.

###### ii.    *Analysis*

"'The Fourth Amendment requires that a search not continue longer than necessary to effectuate the purposes of an investigative stop,'" and "[a]n investigative stop must cease once reasonable suspicion or probable cause dissipates." *United States v. Mosley*, 878 F.3d 246, 253 (8th Cir. 2017) (quoting *United States v. Watts*, 7 F.3d 122, 126 (8th Cir. 1993)). In the case of a passenger's motion to suppress evidence after a traffic stop, the Eighth Circuit Court of Appeals explained,

We have consistently held that during a lawful traffic stop, a police officer may conduct an investigation reasonably related in scope to the circumstances that justified the stop. *United States v. Barragan*, 379 F.3d 524, 528 (8th Cir.2004). This includes undertaking a number of routine tasks such as a check of the vehicle's registration and the driver's license and criminal history. *Id*. at 528–29. The officer may also question the car's occupants about their destination and itinerary. *United States v. Linkous*, 285 F.3d 716, 719 (8th Cir.2002). There is no per se time limit on all traffic stops, and complications in carrying out the traffic-related purposes of the stop may justify a longer detention than when a stop is strictly routine. *United States v. Olivera–Mendez*, 484 F.3d 505, 510 (8th Cir.2007). Furthermore, if the investigating officer discovers information leading to reasonable suspicion, he may justifiably extend the stop. *United States v. Quintero–Felix*, 714 F.3d 563, 567 (8th Cir.2013).

*United States v. Anguiano*, 795 F.3d 873, 876 (8th Cir. 2015).

On the other hand, "'[a] seizure justified only by a police-observed traffic violation . . . becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation.'" *United States v. Tuton*, 893 F.3d 562, 568 (8th Cir. 2018) (quoting *Rodriguez v. United States*, 135 S.Ct. 1609, 1612 (2015)); *Peralez*, 526 F.3d at 1119 (explaining that a "constitutionally permissible traffic stop can become unlawful . . . 'if it is prolonged beyond the time reasonably required to complete' its purpose." (quoting *Caballes*, 543 U.S. at 407)). More specifically,

In *Rodriguez v. United States*, the Supreme Court held that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission.'" ––– U.S. ––––, 135 S.Ct. 1609, 1614, 191 L.Ed.2d 492 (2015). In other words, "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures," *id*. at

1612, because a "seizure remains lawful only so long as [unrelated] inquiries do not measurably extend the duration of the stop," *id.* at 1615 (internal quotation marks omitted) (alteration in original). When conducting a traffic stop, the "mission" of stopping the vehicle is to address a traffic violation and related safety concerns. Applying this logic, the Supreme Court concluded that law enforcement cannot unlawfully extend a traffic stop to allow a drug-sniffing dog to check for narcotics after the traffic violation has already been addressed. *Id.* at 1614–15, 1616–17 (remanding to determine "whether reasonable suspicion of criminal activity justified detaining [the defendant] beyond the completion of the traffic infraction investigation").

*Mosley*, 878 F.3d at 253. In *Mosley*, the court concluded that the duration of the stop was reasonable, because the law enforcement officers "diligently and without measurable delay" pursued the mission of assessing whether the vehicle was involved in a bank robbery. *Id.* at 255.

I concluded, just above, that Sgt. Kober unreasonably pursued permission for impoundment and an inventory search from EAN Holdings as a pretext for an investigative search and that he unreasonably failed to try to contact Cari Rigdon to verify whether she had given Pope and Davis permission to use the rental SUV. I now conclude that those actions unlawfully prolonged the stop "'beyond the time reasonably required to complete the mission of issuing a ticket for the [speeding] violation.'" *Tuton*, 893 F.3d at 568 (quoting *Rodriguez*, 135 S.Ct. at 1612). Unlike the situation in *Mosley*, 878 F.3d at 255, Sgt. Kober did not "diligently and without measurable delay" pursue the proper "mission" of the stop, the speeding ticket, even if the presence of the firearm in a case in the backseat permitted some further inquiry. Nor did he "diligently and without measurable delay" pursue his new "mission" of determining whether Pope and Davis should be left in possession of the rental SUV after discovering that they were not the

original renters and did not have the rental agreement, but did claim to have permission from the renter to use the SUV. Again, it was not reasonable for Sgt. Kober to believe that Pope and Davis "wrongfully possessed" the SUV, even if they were not authorized drivers on the rental agreement, and the diligent and reasonable manner to confirm whether they were properly in possession of the vehicle would have been to try to contact Cari Rigdon to verify that she had given Pope and Davis permission to use the SUV. Sgt. Kober knew that Cari Rigdon had purportedly rented the vehicle for Pope and Davis within the first few minutes of the stop, *see* Video at 2:41-3:03; Sgt. Kober's Report at 1, but he never asked Pope or Davis for her contact information or whereabouts, nor did he seek the assistance of dispatch in locating her. *See also* Transcript at 32:3-10 (admission by Sgt. Kober that he really didn't care who or where Cari Rigdon was or whether she had given Pope or Davis permission to use the SUV).

At a minimum, almost fifteen minutes elapsed from the point when Sgt. Kober had sufficient information to allay his concerns—that is, he knew that Pope and Davis had misdemeanor charges in the past, but neither Pope nor Davis had any felony convictions, *id*. at 15:10-35; Transcript at 28:14-18; Sgt. Kober's Report at 1; knew that the SUV was rented from "EAN Holdings out of Augusta, Georgia," Video at 21:22-30; knew that the gun had not been reported stolen, Transcript at 28:19-25; and knew that Pope had a "driving under the influence (DUI) alcohol/drug" charge in 2010, but no similar charges recently, Video at 24:55-25:12—and his commencement of the purported inventory search approximately thirty-nine minutes after the stop. Almost all that time was expended by Sgt. Kober's call to EAN Holdings, making arrangements for the tow, and removing the occupants from the SUV for the pretextual inventory search—none of which was appropriate or reasonably necessary to the proper "mission" of the stop. Sgt. Kober essentially admitted that, during the entire stop, Pope and Davis were not free to leave, because he would not have just let them go. Transcript at 53:23-54:13.

Because I conclude that a pretextual inventory search unjustifiably prolonged the stop, and Davis has standing to challenge the extension of the stop, *Peralez*, 526 F.3d at 1121, the evidence from the stop must be suppressed, unless it was somehow otherwise properly obtained.

### 4.    The alternative probable cause theory

The prosecution does argue that the evidence from the stop was otherwise properly obtained. In the alternative, the prosecution argues that there was probable cause for the search, notwithstanding Sgt. Kober's assertions that he conducted only an inventory search and his personal belief that he did not have probable cause.

#### a.    Arguments of the parties

The prosecution argues that Sgt. Kober had probable cause to search the vehicle based on the conduct of the occupants, where neither Pope nor Davis was an authorized driver of the SUV, where they did not rent it, did not have the agreement, and were not listed on the rental agreement as additional drivers. Also, the prosecution argues that Sgt. Kober saw numerous zip-lock baggies in Pope's backpack, which Pope tried to hide, and which Sgt. Kober knew were a common tool of the trade for drug traffickers, and Sgt. Kober saw that Pope was overly nervous, breathing heavily, and shaking. The prosecution also argues that Davis admitted that he was in possession of a loaded firearm, which is a violation of Iowa law. The prosecution argues that, in the totality of these circumstances, applying a common-sense approach, there was a fair probability that contraband was located within the vehicle.

In his reply, Davis points out that, although probable cause is an objective standard, Sgt. Kober did not believe he had probable cause for a search. He also argues that the prosecution's reliance on the fact that neither of the occupants of the SUV was the authorized driver on the rental agreement is misplaced, because a violation of the rental agreement is not a criminal matter. In his proposed findings of fact and conclusions

of law, Davis argues that the mere presence of baggies is offset by the lack of any other suspicious circumstances suggesting drug use or trafficking. Those offsetting circumstances, he argues, are that Sgt. Kober did not see any drugs in the baggies, there was no odor of drugs from the SUV, neither Pope nor Davis appeared to be under the influence of drugs, both gave prompt and truthful replies to questions, both were cooperative throughout the stop, and they only had minimal criminal histories.

In its reply to Davis's proposed statement of facts and conclusions of law, the prosecution argues that the following facts confirm probable cause existed to search the vehicle: Pope was breathing heavily, shaking, and excessively nervous; Sgt. Kober observed numerous plastic baggies, which are commonly associated with drug trafficking, in the vehicle; Pope attempted to hide the plastic baggies even after being confronted, which was unusual; Sgt. Kober observed the loaded firearm; the renter was not present; an unauthorized driver and passenger were in possession of the rental vehicle; the occupants did not have the rental agreement; and EAN Holdings requested that the vehicle be towed because it was wrongfully possessed.

### b. Analysis

"No warrant is required to search a car with probable cause." *United States v. Pulido-Ayala*, 892 F.3d 315, 319 (8th Cir. 2018) (citing *Carroll v. United States*, 267 U.S. 132, 149 (1925)); *United States v. Edwards*, 891 F.3d 708, 712 (8th Cir. 2018) ("Under the automobile exception to the warrant requirement, officers may conduct a warrantless search of a vehicle if they have probable cause to believe that the car contains contraband or other evidence." (citing *California v. Acevedo*, 500 U.S. 565, 580 (1991)). "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Murillo-Salgado*, 854 F.3d 407, 418 (8th

Cir.) (internal quotation marks and citations omitted), *cert. denied*, 138 S. Ct. 245 (2017). More specifically,

> Probable cause is a "practical and common-sensical standard" that is based on "the totality of the circumstances" and requires only "the kind of fair probability on which reasonable and prudent people, not legal technicians, act." [*Florida v. Harris*, 568 U.S. 237, 244 (2013)]. (internal quotations, alterations, and citations omitted). Moreover, "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search," *[United States v.] Ross*, 456 U.S. [798,] 825, 102 S.Ct. 2157 [(1982)], including a passenger's personal belongings, *Wyoming v. Houghton*, 526 U.S. 295, 302, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999). In determining whether probable cause exists, an officer "may draw inferences based on his own experience." *Ornelas v. United States*, 517 U.S. 690, 700, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

*Murillo-Salgado*, 854 F.3d at 418. Probable cause is an objective determination, which does not turn on an officer's subjective opinion about whether the officer does or does not have probable cause for a search. *Edwards*, 891 F.3d at 712. Indeed, "'[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.'" *United States v. Rowe*, 878 F.3d 623, 628 (8th Cir. 2017) (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)), *cert. denied*, 138 S. Ct. 1602 (2018).

Here, I conclude that the totality of the circumstances would not lead a reasonable person to believe there was a fair probability that contraband or evidence of a crime would be found in the rental car. *Murillo-Salgado*, 854 F.3d at 418. First, even recognizing that the question is an objective one in which the officer's subjective opinions are not determinative, *see Edwards*, 891 F.3d at 712, I think it is telling that a very experienced officer, like Sgt. Kober, with nearly two decades in law enforcement,

thousands of traffic stops, and hundreds of vehicle searches, who believed himself capable of making quick determinations of probable cause, did not think that he had probable cause to search the SUV at any point and never even mentioned the possibility of probable cause to either his ride-along passenger or Trooper Farver. Trooper Farver also never raised the possibility of probable cause. I find it particularly strange that courts might give deference to the inferences apparently drawn from the facts by law enforcement officers, when deciding the issue of probable cause, which is supposedly an objective determination, *see United States v. Winarske*, 715 F.3d 1063, 1067 (8th Cir. 2013), but would not give some weight to the beliefs of officers, at the time of the search, that they did not have probable cause. However, that is the state of Fourth Amendment law, and I must follow it.

Second, some of the circumstances on which the prosecution relies, such as lack of the renter in the vehicle; an unauthorized driver and passenger possessing the rental vehicle; lack of the rental agreement; and EAN Holdings's request that the vehicle be towed because it was not being driven by an authorized driver, add up to nothing suggesting evidence of a crime would be found in the SUV. *See Murillo-Salgado*, 845 F.3d at 418 (probable cause requires a fair probability that evidence of a crime will be found). A belief that some "wrongful conduct" short of criminal activity is occurring does not amount to probable cause. Nothing suggests that any of these circumstances was or was suggestive of criminal activity, particularly where the totality of the circumstances included Pope's and Davis's cooperation with all of Sgt. Kober's questions and their prompt admissions that someone else, Cari Rigdon, had rented the vehicle for them and that they did not have the rental agreement. Certainly, EAN Holdings never suggested or gave Sgt. Kober any reason to suspect that the rental car had been stolen or taken from Cari Rigdon without her permission. Also, because the permission of the renter, Cari Rigdon, for Pope and Davis to use the rental vehicle would have created a

bailment under Georgia law, *see Hall*, 477 S.E.2d at 366, and contacting Rigdon could have promptly dispelled any concerns about the legality of their possession, it is particularly unreasonable to rely on supposed "wrongful possession" of the vehicle as a basis for probable cause.

Other circumstances identified by the prosecution, considered either singly or collectively, fall short of creating an objectively reasonable belief that there was probable cause. The prosecution does not argue that Pope's nervousness—even extreme nervousness—heavy breathing, and shaking during a traffic stop, standing alone, establish probable cause, because while a traffic stop is a routine situation for law enforcement officers, it is not a routine one for most people. Also, I am hesitant to attribute much weight to Sgt. Kober's testimony that he thought Pope was trying to hide things in his backpack by shoving clothes around while he was looking for his identification, because it seems just as likely to me that Pope was trying to see into the backpack himself in the limited light in the car during a nighttime stop, even with the dome light on, while stirring through his belongings looking for his identification. Also, although the smell of drugs and the presence of drugs in plain view are sufficient to establish probable cause, *see, e.g., United States v. Wright*, 844 F.3d 759, 763 (8th Cir. 2016); *United States v. Walker*, 840 F.3d 477, 484 (8th Cir. 2016), neither was present, here.

Although a loaded firearm may be a suspicious circumstance, in the midst of other circumstances, this firearm was not in the front seat, in either Pope's or Davis's hands, or secreted somewhere only barely in view and readily reachable, it was in a case in the back seat of the SUV, and the case was in plain view such that Sgt. Kober could see it through the window of the vehicle. *Compare United States v. Peyton*, 108 F.3d 876, 877 (8th Cir. 1997). Even if the fact that the firearm was loaded—although there was no bullet in the chamber—was a violation of Iowa law, not even Sgt. Kober thought it constituted an offense subject to arrest.

The discovery of a plastic bag containing a drug or drug residue in plain view or seen by an officer being discarded by a person from the car or the presence of baggies with stretched, torn, or cut corners may also establish probable cause, *see United States v. Daniels*, 809 F.3d 447, 449 (8th Cir. 2016); *United States v. Shockley*, 816 F.3d 1058, 1062 (8th Cir. 2016), but nothing like that was discovered prior to the search, just empty baggies, which would hardly be a surprising thing to find in a vehicle that the officer had been told was being used for a cross-country trip. If the simple presence of plastic baggies and a firearm inadvertently left loaded in a gun case in a car add up to probable cause to search a vehicle, many hunters in Iowa who stop in their cars for a picnic may find themselves subject to search.

In short, the totality of these circumstances does not result in a whole that is greater than the sum of its parts and more specifically, I conclude, does not add up to probable cause. Therefore, the search of the SUV in this case cannot be upheld on the alternative basis that Sgt. Kober had probable cause.

### 5. Summary

I conclude that the portion of Davis's Motion To Suppress seeking suppression of evidence seized from a rental car in which he was a passenger should be granted. I conclude that Davis's Fourth Amendment rights against unreasonable search and seizure were violated by the pretextual inventory search which improperly prolonged the original traffic stop for speeding, and that Fourth Amendment violation requires suppression of all evidence seized from the vehicle.

## B. The Evidence Obtained During Transport

Davis also seeks suppression of the statements he allegedly made while he was being transported by law enforcement officers to his initial court appearance, on the

ground that they were obtained in violation of his right to counsel. The prosecution does not contest this part of Davis's Motion To Suppress. There is no dispute that Davis had clearly and unambiguously invoked his right to counsel before he was transported to his initial appearance by the officers. *See Davis v. United States*, 512 U.S. 452, 461-62 (1994) (officers are required to stop questioning if a suspect's request for an attorney is clear and unambiguous). I agree that Davis was subsequently subjected to "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). In these circumstances, I agree with the parties that Davis's statements to the officers while he was being transported to his initial court appearance must be suppressed.

## III.   CONCLUSION

Upon the foregoing, defendant Davis's May 22, 2018, Motion To Suppress (docket no. 43) is **granted**, as to both evidence seized from a rental car in which he was a passenger and statements he allegedly made while he was being transported by law enforcement officers to his initial court appearance.

**IT IS SO ORDERED**.

**DATED** this 14th day of August, 2018.

_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA